THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

LISA MONTONE                        :
                                    :
                 Plaintiff          :
        v.                          :    3:11-CV-2252
                                    :    (JUDGE MARIANI)
SCHUYLKILL HEALTH SYSTEM            :
                                    :
                 Defendant          :

## MEMORANDUM OPINION

### I.  Introduction

Plaintiff Lisa Montone ("Plaintiff") filed a five-count Complaint (Doc. 1) against

Defendant Schuylkill Heath System ("Defendant" or "the Hospital") for discrimination (Count

I) and retaliation (Count II) under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §

12101, et seq., interference (Count III) and retaliation (Count IV) under the Family and

Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 et seq., and violations of the

Pennsylvania Human Relations Act ("PHRA") (Count V), 43 PA. CONS. STAT. § 951, et seq.

Presently before the Court is Defendant's Motion for Summary Judgment.  (Doc. 28).  In her

Brief in Opposition, Plaintiff only contests Defendant's Motion insofar as it pertains to her

FMLA retaliation claim (Count IV).  (Doc. 35 at 1).  Since Plaintiff "is not proceeding" with

Counts I-III, or V, the Court will dismiss those Counts with prejudice.[1]  For the reasons that

follow, the Court will deny Defendant's Motion with respect to Count IV.

## II.  Statement of Facts

### A.  Background

Created in 2008, Defendant is the parent corporation of the Good Samaritan

Regional Medical Center ("Good Samaritan"), now known as SMC-East ("East"), and the

Pottsville Hospital and Warne Clinic, now known at SMC-South Jackson Street ("South").

(Def.'s Statement of Undisputed Material Facts ("DSOF"), Doc. 29, at ¶ 1).  Plaintiff worked

for Defendant and its predecessors since May 11, 1979.  (Pl.'s Counter Statement of

Material Facts ("PCSOF"), Doc. 34, at ¶ 139).  Prior to August 2008, Plaintiff worked for

Good Samaritan as Director of Patient Account and Physician Billing.  (DSOF at ¶ 3).  When

East and South merged on August 1, 2008, Plaintiff became Defendant's Director of Patient

---

[1]  Plaintiff explicitly states that she "is not proceeding on Count I (ADA), Count II (retaliation) Count III (FMLA) or Count V (PHRA) of her Complaint." (Doc. 35 at 1 n.1). Given Plaintiff's express withdrawal of these claims, the Court will dismiss Counts I-III, V pursuant to Federal Rule of Civil Procedure 41(a)(2).

"Where, as here, the plaintiff fails to specify whether the request is for dismissal with or without prejudice, the court has discretion to grant a Rule 41(a) dismissal with prejudice, without prejudice, or to place conditions on dismissal." *Dodge-Regupol, Inc. v. RB Rubber Prod., Inc.*, 585 F. Supp. 2d 645, 652 (M.D. Pa. 2008). Generally, courts within the Third Circuit take a "restrictive approach to granting dismissal without prejudice." *Id.* (citing *Schandelmeier v. Otis Div. of Baker-Material Handling Corp.*, 143 F.R.D. 102, 103 & n.2 (W.D. Pa. 1992) (citing *Ferguson v. Eakle*, 492 F.2d 26, 28–29 (3d Cir. 1974)). In determining whether or not to dismiss with prejudice, "it is necessary to weigh the prejudice to the defendant, both in terms of legal prejudice and litigation expense, together with the plaintiff's diligence in bringing the motion and explanation therefore." *Schandelmeier*, 143 F.R.D. at 103. "Another factor to consider is the pendency of a dispositive motion[.]" *Id.*

Here, three factors require the Court to dismiss Counts I-III, and V with prejudice. First, there is no explanation as to why Plaintiff is "not proceeding" with these Counts. Second, Plaintiff's request for withdrawal comes fifteen months after the filing of the Complaint. Third, Plaintiff sought to withdraw these claims only after the completion of discovery and after Defendant filed lengthy Motion for Summary Judgment, "which undoubtedly has been the product of some effort and expense on the part of" Defendant. *See id.* (dismissing with prejudice where "plaintiffs move[d] to dismiss their complaint after it ha[d] been pending for twenty months" and where "Plaintiffs d[id] not explain why they s[ought] dismissal without prejudice, [and] d[id not] . . . provide any opposition to defendants' [summary judgment] motion").

Accounts, overseeing patient registration and accounting for both East and South. (*See id.* at ¶¶ 4-7, 13-15).

As the Hospital's Director of Patient Accounts, two Supervisors of Patient Accounting reported to Plaintiff, Ethel Dougherty ("Dougherty"), the Supervisor at East, and Scott Wall ("Wall"), the Supervisor at South. (*Id.* at ¶¶ 5-6; Montone Dep., Pl.'s Ex. 3, Doc. 33-3, at 55:5-6). Plaintiff reported to the Chief Financial Officer ("CFO"), who in turn answered to Chief Executive Officer ("CEO"). (DSOF at ¶¶ 9, 11). Diane Boris ("Boris") became the Interim CFO on January 25, 2010. (*Id.* at ¶ 10). On May 30, 2010, she became Vice President of Finance/CFO. (*Id.*). John Simodejka ("Simodejka") was CEO. (*Id.* at ¶ 11).

B. CPSI Information System

In July 2009, Defendant implemented the CPSI Information System ("CPSI") at East to facilitate and streamline the billing and collections process. (*Id.* at ¶ 16). Although South had been using CPSI prior to the merger,[2] East had previously utilized a different information system, Meditech. (*Id.* at ¶ 17; Montone Dep. at 41:3-42:23). "Plaintiff was directly involved with the planning, testing, conversion, and implementation of the CPSI system" and was responsible for ensuring "that the billing clerks at both East and South knew how to use the CPSI system." (DSOF at ¶¶ 18, 27).

---

[2] Plaintiff testified that prior to the merger, South, which had previously been using CPSI, experienced difficulties with CPSI. (Montone Dep. at 371:6-9). She stated that part of the reason that Defendant selected her over South's Patient Account Manager following the merger was because South's accounts receivable were "so un-Godly bad with CPSI." (*Id.*).

Under the CPSI system, the Hospital processed patient claims internally then sent them to the primary payors. (*Id*. at ¶¶ 20-24). Once the primary payor paid its portion of the bill, the claim would return to the Hospital, whose billing clerks would review it before forwarding it to secondary and subsequent payors as necessary. (*Id*. at ¶ 25). Payments were not made automatically. (*See id*. at ¶ 26). "Generally, Medicare paid Schuylkill approximately fourteen (14) days after receiving a particular claim; Blue Cross and Blue Shield paid approximately five (5) to seven (7) days after receiving a claim; and commercial carriers paid up to forty-five (45) days after receiving a claim." (*Id*.).

According to Plaintiff, East's conversion to CPSI in July 2009 presented substantial difficulties. Plaintiff testified that CPSI billing could not be tracked as easily as with Meditech. Whereas Meditech allowed billing clerks to automatically track what percentage of a bill would be paid by a primary payor, CPSI only displayed the total amount owed on a particular bill. (*See* Montone Dep. at 72:15-21, 78:4-79:22). According to Plaintiff, this limitation, in combination with the fact that different payors paid at different time intervals upon receipt of a claim (*see* DSOF at ¶ 26), made it impossible to know when a particular claim would be paid and in what amount. (*See* Montone Dep. at 321:13-21, 323:2-8).

Tracking claims with CPSI could only be done manually, "a very time consuming process." (*Id*. at 78:4-79:25). Unlike Meditech, Plaintiff alleges that CPSI was not a fully automated system (*id*. at 79:16-22), and it required twice the number of billing clerks to operate. (Montone Resp. to Def.'s EEOC Position Statement ("EEOC Resp."), Def.'s Ex. Q,

Doc. 29-6, at ECF[3] 39). Despite the fact that East needed "more manpower" because of the CPSI conversion, Plaintiff's superiors prohibited her from increasing her staff. (Montone Dep. at 92:2-93:4).

Plaintiff testified that CPSI was designed for "very, very small" hospitals, with twenty to thirty beds. (*Id*. at 84:25-85:2). When East and South merged, they combined to "make up a system of approximately 316 acute care beds[.]" (DSOF at ¶ 2). According to Plaintiff, the Hospital was CPSI's "biggest facility." (Montone Dep. at 265:19). Given that East and South shared the same system, Plaintiff testified that Defendant presented a "very unique" set of circumstances for CPSI, circumstances CPSI had not previously encountered. (*Id*. at 265:17-266:3). Plaintiff further testified that Simodejka "specifically" told his employees "in management meetings that [they] were not to complain about CPSI or . . . [they] would be fired." (*Id*. at 371:20-372:2).

## C. Multiple Sclerosis Diagnosis

Near the end of October 2009, Plaintiff was diagnosed with multiple sclerosis ("MS") and was hospitalized until November 3, 2009. (*Id*. at 177:11-18). Due to her MS and the resultant issues she experienced with her sight, Plaintiff was initially released with restrictions. (*Id*. at 177:19-178:1). Since she could not work full time, she worked part time until early January 2010. (*See id*. at 176:22-177:3). Plaintiff underwent physical therapy between February and March 2010. (*Id*. at 392:24-393:1).

---

[3] Many of the exhibits submitted to the Court did not include page numbers. As a result, the Court uses the pagination of its electronic filing system for those exhibits, citing those pages as "ECF X".

Plaintiff's MS caused her significant discomfort at work. She experienced "leg pains and [would] just not feel good in general." (*Id.* at 376:19-21). Plaintiff's MS also affected her vision (*id.* at 177:21-178:1), memory (*id.* at 397:24-398:5) and energy level (Montone Notes[4], Pl.'s Ex. 4, Doc. 34-7, at 20-21). At times, her MS caused her to become "so exhausted that [she couldn't] get up[.]" (*Id.*). Plaintiff testified that she would "have crippling headaches every day" and "was chewing Tramadol [a pain reliever] . . . just to get through [the] day at work." (*Id.* at 374:8-11). She stated that "sometimes the headaches were so bad that . . . I would be afraid to drive." (*Id.* at 376:21-23).

These symptoms were compounded by the considerable stress Plaintiff experienced upon her return to full time work in January 2010. (*See id.* at 145:6-8). According to Plaintiff, her "stress level" was adversely impacted by Boris "screaming at [her] and every other thing[.]" (*Id.* at 374:12-14). Plaintiff feared that the stress, which was a "big contributor" to her headaches, would cause another "exacerbation" of her MS. (*Id.* at 379:22-380:3).

D. "Cash Flow Issues" and the "Chopping Block"

When Plaintiff returned to full time in January 2010 (*id.* at 176:25-177:3), Defendant was "experiencing cash flow issues" (DSOF at ¶ 83). As of January 7, 2010, the Hospital was "operating at a loss of approximately $2.8 million." (*Id.*). In the ensuing months, Boris sent several emails to Plaintiff and her staff discussing the scope and urgency of the

---

[4] Between February and July 2010, Plaintiff kept a handwritten notebook. (PCSOF at ¶ 146). Plaintiff testified, "the whole memory thing was not real good . . . when I came back from my [MS] exacerbation, so I just started writing stuff down – so I could remember things." (Montone Dep. at 397:23-398:5).

Hospital's "continuing decline in revenue." (*See e.g., id.* at ¶¶ 30, 33, 61, 64, 70). For instance, on "February 11, 2010, Boris emailed Plaintiff, Dougherty and Wall, stating, in pertinent part: 'Hi all - I need all of you and everyone in the patient acctg. dept. reviewing claims status. Cash is in a dire situation. I still think that we have problems with either claims held up somewhere, claims that didn't go anywhere, etc.'" (*Id.* at ¶ 33). Plaintiff forwarded this email to her staff (*id.* at ¶ 34), who became aware of Defendant's financial issues, "how important CASH [wa]s and . . . what [wa]s needed on their part." (Def.'s Ex. H, Doc. 29-4, at ECF 11).

According to Plaintiff, Defendant's revenue deficiencies translated into incessant inquiries into whether she was managing her department properly and threats that the Patient Accounting Department would "be outsourced to Alabama." (*See e.g.,* Montone Notes at 6, 12). In February 2010, Boris told Plaintiff, Director of Financial Services Bernie Koskulitz ("Koskulitz") and the Hospital's Accountant Kathy Hughes ("Hughes") "that all our heads were on the chopping block if we didn't get money in." (DSOF at ¶ 35). Plaintiff alleges that Boris used this "chopping block" analogy three to four times a week. (Pl.'s Answer to Def.'s Statement of Material Facts ("PASOF"), Doc. 33, at ¶ 35). Plaintiff also testified that Boris would frequently yell at Plaintiff despite being aware that she was coping with daily "crippling headaches" due to her MS. (Montone Dep. at 374:7-17). Allegedly, Boris told her that the CEO was watching her, that she should be careful and that she was going to be fired due to Defendant's poor finances. (DSOF at ¶ 37).

As part of this close supervision, which Plaintiff later characterized as "micromanagement" (EEOC Resp. at ECF 40), Simodejka required Plaintiff to send him the Hospital's daily deposit totals (Montone Notes at 5). Boris also questioned whether Plaintiff and her staff were doing everything they could to increase revenue and review claims. (*Id.* at 12). As a result, Boris instructed Plaintiff to develop at least three "action plans" between mid-March and Plaintiff's termination in July 2010. (*See* Def.'s Exs.' I-K).

### E. FMLA Leave and Termination

Due to Defendant's financial situation and the pressure Boris and Simodejka placed upon her, Plaintiff testified that she was reticent to take days off despite experiencing symptoms related to her MS. She testified that Boris prohibited her from taking time off except for an FMLA absence. (Montone Dep. at 234:22-24). As a result, Plaintiff felt that she had to file for FMLA in order to take time off for her MS. (*Id.* at 234:24-235:2). According to Plaintiff, although her doctor recommended that she "take a full-time FMLA," she requested intermittent leave instead. (*Id.* at 234:24-235:5; PCSOF at ¶ 134). On March 29, 2010, Boris approved Plaintiff's request. (PCSOF at ¶ 138). Between the date Plaintiff requested FMLA leave on March 26, 2010 and her discharge on July 27, 2010, "Plaintiff took a combined 137 hours in vacation leave, sick leave, and personal leave." (*Id.* at ¶ 145).[5]

---

[5] "The Hospital's FMLA Policy requires an employee to substitute its accrued paid sick leave, vacation leave, and personal leave for the FMLA leave provided, which then runs concurrently with the unpaid FMLA leave." (DSOF at ¶ 112).

According to Plaintiff's notes, on April 13, 2010, Boris told her that Simodejka and Boris were "concern[ed] with what [her] intension [sic] [wa]s with [her] FMLA." (Montone Notes at 15). Plaintiff wrote that Boris "didn't know if she should [or] could ask me[,] but they were concerned if I was looking for a job when I would take a day off[.]" (Id.). Plaintiff took FMLA leave between April 29 and May 12, 2010. (Id. at 19; Montone Dep. at 401:4-9).[6] Upon her return from FMLA leave, Plaintiff met with Boris on May 12, 2010. In her notes, Plaintiff wrote that Boris

> began by questioning my medical leave and [said] her [sic] & John [Simodejka] . . . are still concerned that I'm actively looking for a job. I explained to her, 3rd time, that the reason I took an FMLA was because I do, whether I like it or not[,] have an illness[,] and there are days that I am so exhausted that I can't get up, or my legs ache or I have this weird feeling on the [right] side of my head, but that I will only take off when I really need too. I don't understand why I continue to get grilled for an FMLA.

(Montone Notes at 19-21).

Plaintiff took FMLA sick days on Friday, July 23, 2010 and Monday, July 26, 2010. (Id. at 25-26). On Tuesday, July 27, 2010, Defendant fired Plaintiff. (DSOF at ¶ 126). Defendant's stated rationale for Plaintiff's discharge was that she "failed to manage the bill/collection of patient accounts to the extent that [Defendant] experienced significant revenue shortfall." (PASOF at ¶ 127). During Plaintiff's tenure as Director of Patient Accounts, Defendant's revenue declined and its financial difficulties continued. (See DSOF at ¶¶ 82-95, 129).

---

[6] The record is not entirely consistent as to whether and to what extent Plaintiff actually spent time on leave during this period. Plaintiff's notes and deposition testimony indicate that Plaintiff took FMLA leave April 29 and May 12, 2010. However, it also appears that Plaintiff worked at times during this period.

### III. Motion for Summary Judgment

Through summary adjudication, courts may dispose of those claims that do not

present a "genuine issue as to any material fact." FED. R. CIV. P. 56(a). Summary judgment

"should be rendered if the pleadings, the discovery and disclosure materials on file, and any

affidavits show that there is no genuine issue as to any material fact and that the movant is

entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Turner v. Schering-Plough

Corp.,* 901 F.2d 335, 340 (3d Cir. 1990). "As to materiality, . . . [o]nly disputes over facts

that might affect the outcome of the suit under the governing law will properly preclude the

entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct.

2505, 91 L. Ed. 2d 202 (1986).

The party moving for summary judgment bears the burden of showing the absence

of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106

S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-

moving party must offer specific facts contradicting those averred by the movant to establish

a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct.

3177, 111 L. Ed. 2d 695 (1990). "Inferences should be drawn in the light most favorable to

the non-moving party, and where the non-moving party's evidence contradicts the movant's,

then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am.,

Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912, 113 S. Ct. 1262, 122 L.

Ed. 2d 659 (1993).

## IV. Analysis

The FMLA provides up to twelve workweeks of unpaid leave during a twelve-month period for certain family reasons and any serious health condition that makes the employee unable to perform the functions of his position. 29 U.S.C. § 2612(a)(1). When an employee invokes his FMLA rights, an employer may not "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful." 29 U.S.C. § 2615 (a)(2). "To prevail on a retaliation claim under the FMLA, the plaintiff must prove that (1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights." *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 301-02 (3d Cir. 2012). "[A]n employee does not need to prove that invoking FMLA rights was the sole or most important factor upon which the employer acted." *Id.* at 301.

Courts have borrowed from employment discrimination law to assess claims of FMLA retaliation. Thus "claims based on circumstantial evidence have been assessed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973), while claims based on direct evidence have been assessed under the mixed-motive framework set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 276–77, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989) (O'Connor, J., concurring)." *Id.* at 302.[7]

---

[7] The Court will analyze Plaintiff's retaliation claim under the *McDonnell Douglas* framework instead of the *Price-Waterhouse framework*. *Id.* at 302 ("Although Lichtenstein calls on us to apply the mixed-motive

> Under the *McDonnell Douglas* framework, [the employee] has the initial burden of establishing a *prima facie* case.  To do so, she must point to evidence in the record sufficient to create a genuine factual dispute about each of the three elements of her retaliation claim: (a) invocation of an FMLA right, (b) termination, and (c) causation.  If [the employee] can do so, the burden of production shifts to [the employer] to articulate some legitimate, nondiscriminatory reason for its decision.  If [the employer] meets this minimal burden, [the employee] must point to some evidence, direct or circumstantial, from which a factfinder could reasonably . . .  disbelieve [the employer's] articulated legitimate reasons.

*Id.* (internal citations and quotations omitted).

Here, it appears that Defendant only challenges the third element of Plaintiff's *prima facie* case, arguing that "she cannot prove a causal connection between her exercise of FMLA rights and her termination." (Def.'s Br. in Support, Doc. 30, at 37).[8] "To demonstrate a *prima facie* case of causation, [an employee] must point to evidence sufficient to create an inference that a causative link exists between her FMLA leave and her termination." *Lichtenstein*, 691 F.3d at 307. "When the 'temporal proximity' between the protected activity and adverse action is 'unduly suggestive,' this 'is sufficient standing alone to create an inference of causality and defeat summary judgment.'" *Id.* (quoting *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007)).

In the present case, Plaintiff took FMLA days on consecutive business days, Friday, July 23 and Monday, July 26, 2010.  (Montone Notes at 25-26).  Defendant fired her on July

---

framework to her retaliation claim, she readily survives summary judgment under the more taxing *McDonnell Douglas* standard.").

[8] As Plaintiff points out, Defendant admits in its Statement of Undisputed Material Facts that Plaintiff requested intermittent leave under the FMLA (satisfying the first element of her *prima facie* case) and was terminated (satisfying the second element).  (Pl.'s Br. in Opp. at 4 (citing DSOF at ¶¶ 38, 44)).

27, 2010, the following day. (DSOF at ¶ 126). As a result, the temporal proximity between Plaintiff's use of her intermittent FMLA and her termination is "unduly suggestive" and "is sufficient standing alone to create an inference of causality[.]" *See Lichtenstein*, 691 F.3d at 307 (finding that "the temporal proximity in this case is in the realm of what this Court and others have found sufficient at the *prima facie* stage" where the termination of the employee occurred "just seven days after she invoked her right to FMLA leave, and just three days after [she] returned from vacation") (internal quotation marks omitted)). *See also Keiderling v. RFM Servs., Inc.*, 3:12-CV-1972, 2014 WL 297522, at *8 (M.D. Pa. Jan. 27, 2014) (finding temporal proximity was unduly suggestive where the employee "was fired the day after returning from his fourth consecutive absence from work"); *Fuller v. AT&T*, CIV.A. 12-1001, 2014 WL 66019, at *9 (W.D. Pa. Jan. 8, 2014) ("Although the Third Circuit Court of Appeals has not recognized a bright line rule of what constitutes sufficient temporal proximity, the law is clear that three days is in the realm of what is considered sufficient at the *prima facie* stage.").

Defendant argues, "temporal proximity alone does not establish causal linkage when the proximity of plaintiff's termination in relation to her FMLA leave was actually the result of documented performance deficiencies occurring before leave." (Def.'s Br. in Supp., Doc. 30, at 38). Defendant cites two unpublished cases in support of this proposition, *Capilli v. Whitesell Construction Co.*, 271 F. App'x 261 (3d Cir. 2008) and *Constant v. Mellon Bank, N.A.*, 2006 WL 1851296 (W.D. Pa. July 3, 2006) *aff'd sub nom. Constant v. Mellon Fin.*

*Corp.*, 247 F. App'x 332 (3d Cir. 2007). However, there exists a notable difference between the present matter and *Capilli* and *Constant*. Those cases involved performance deficiencies documented in negative performance reviews and disciplinary memoranda. *Capilli*, 271 F. App'x at 262-64; *Constant*, 2006 WL 1851296 at *2-4.

Here, in contrast, Defendant offers no evidence that Plaintiff's alleged inadequacies resulted in disciplinary action or poor performance reviews. In fact, Boris did not produce a performance evaluation for Plaintiff during the period at issue. (EEOC Resp. at ECF 39, 41). According to Plaintiff, the last review she received, from Boris' predecessor, indicated "high performance." (*Id.* at 39).

Defendant also asserts that Plaintiff's *prima facie* case for causation is undercut by Plaintiff's admission that she "does not believe that the Hospital discriminated against her because she was on intermittent FMLA leave." (Def.'s Br. in Supp. at 37). This characterization takes liberties with Plaintiff's deposition testimony. First, Plaintiff was asked, "Do you believe that your termination from employment was related to your MS in any way?" (Montone Dep. at 379:3-4). Plaintiff responded,

> I do believe that, yes, I had, you know, headaches, I was on the FMLA. I did go see our HR manager to see if I could get them to stop causing so much stress. Actually, I shouldn't say that. I was called down to HR, and told them, told what was going on. I don't believe I was fired because of MS, but I believe that I was not treated correctly with my MS.

(*Id.* at 379:5-13).

Second, Plaintiff was asked, "do you think you would have gotten [the] same pressure [from Boris and Simodejka] whether you had MS or not?" (*Id.* at 385:5-21). Plaintiff indicated that she believed the pressure would have been the same. (*Id.* at 385:25). Contrary to the Defendant's characterization (Def.'s Br. in Supp. at 37), these statements do not amount to an admission by the Plaintiff that the Hospital did not discriminate against her *because of her intermittent FMLA leave*. This portion of Plaintiff's deposition testimony did not address Plaintiff's FMLA leave, but was instead focused on her MS and her disability claim. Defendant's counsel began this line of questioning with the inquiry, "Tell me every reason why you believe that your termination from you employment was related to your MS." (*Id.* at 378:18-20).

Further, it became even clearer that this testimony only referred to her disability claim, rather than her FMLA retaliation claim, when Defendant's counsel transitioned Plaintiff's deposition to the FMLA claim by stating, "Let's talk about your FMLA claim." (*Id.* at 390:12). Plaintiff was then asked whether the amount of pressure Boris and Simodejka placed upon her "would have happened . . . whether [she] had filed for or requested an intermittent FMLA or not[.]" (*Id.* at 390:12-16). Although Plaintiff answered "[y]es" (*id.* at 390:17), this does not amount to an admission that Defendant did not *discharge* her because of her FLMA leave. Instead, Plaintiff's answer only refers to her work conditions during her employment. While this might hamper an interference claim, it does not undermine her retaliation claim, which pertains to her discharge. Plaintiff did not state that

Defendant would have fired her absent her request for and taking of FMLA leave. Indeed, she was never asked this question.

Since Plaintiff establishes a *prima facie* case of retaliatory discharge, the burden under *McDonnell Douglas* shifts to the employer to articulate a legitimate, non-discriminatory basis for its decision to terminate Plaintiff's employment. *See Lichtenstein*, 691 F.3d at 302. It does not appear that Plaintiff contests that Defendant has offered what it asserts is a legitimate, non-discriminatory reason for her discharge (*see* Pl.'s Br. in Opp., Doc. 35, at 5-12)—that her work performance was allegedly poor (Def.'s Br. in Supp. at 23, 39). Therefore, the burden of production shifts back to Plaintiff to demonstrate pretext. *See Lichtenstein*, 691 F.3d at 302.

"In order to demonstrate that [an employer's] proffered justification for terminating [him] is merely pretextual, [an employee] 'must point to some evidence, direct or circumstantial, from which a factfinder could reasonably . . . disbelieve the employer's articulated legitimate reasons.'" *Lichtenstein*, 691 F.3d at 309-10 (*quoting Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir.1994)). Here, the issue of fact that precludes summary judgment is the degree to which Defendant's poor finances can be attributed to Plaintiff's work performance. Accepting Plaintiff's version of the facts as we must, *see Big Apple BMW*, 974 F.2d at 1363, Plaintiff was a "stellar" employee with an over thirty-year track record with the Hospital and its predecessor (EEOC Resp. at ECF 39), and Defendant's stated reason for firing her rested on factors beyond her control.

According to Plaintiff, Defendant's revenue shortfalls were primarily attributable to the implementation of CPSI. Plaintiff testified that CPSI was ill-suited for the Hospital's size and unique circumstances. (Montone Dep. at 84:25-85:2, 265:19-266:3). Plaintiff further testified that CPSI prevented automatic claim tracking. (*Id.* at 72:15-21, 78:4-79:22). Plaintiff stated that CPSI was not a fully automated system and, therefore, required twice the number of billing clerks. (*Id.* at 79:21-22; EEOC Resp. at ECF 39). Finally, Plaintiff testified that CPSI routinely malfunctioned resulting in unnecessary downtime for her staff. (Montone Dep. at 182:11-183:15).

Plaintiff was not the Hospital's only employee to recognize the problems with CPSI. After CPSI became more involved in the Hospital's billing operations, Boris noted in an email that "we aren't seeing any benefit once CPSI start[ed] working on the accounts." (Def.'s Ex. H, Doc. 29-4, at ECF 11). In response, Wall stated that "there were not any claims sent on 6/30 or 7/1 as there was a problem with CPSI." (*Id.*). Wall went on to state that during the "[l]ast 2 weeks we have been getting emails from CPSI stating there have been technical issues and there possibly will be a delay in transmitting claims." (*Id.*). Additionally, Dougherty sent an email to Plaintiff, Wall Boris, and Simodejka "broadcasting" her frustration with CPSI and the fact that the Patient Accounting Department was being blamed for CPSI failures. (Montone Dep. at 349:23-350:25).

While it is clear that there were issues with CPSI, Defendant attributes those failures to Plaintiff. (*See* DSOF at ¶¶ 18, 27, 64). In an email to Plaintiff, Boris stated, "if you don't

understand something in CPSI -or they are not doing something -it is your responsibility to follow up with them –ask questions -get answers." (*Id.* at ¶ 64). However, the degree to which CPSI failures can be attributed to Plaintiff is a material issue of fact for a jury to resolve. If, as Plaintiff alleges, the stated reason for her discharge has no basis in fact, then a reasonable jury could conclude that Defendant's proffered rationale is pretextual.

In the face of the problems with CPSI, Plaintiff posits that she and her staff understood the gravity of Defendant's "cash flow issues" and were doing everything they could to bring in more revenue. (Montone Dep. at 383:11-19; Def.'s Ex. H, Doc. 29-4, at ECF 11, 28). Although Boris sent many emails concerning Defendant's "dire" financial situation and its lack of improvement, most failed to link Defendant's poor finances with Plaintiff's work performance. (*See e.g.*, Def.'s Ex. H, Doc. 29-4, at ECF 28). Most of Boris' emails to Plaintiff contained vague directives and generalized frustration at the lack of cash flow. For instance, in one email, Boris stated, in part: "I need something substantial that I can see every day that shows that the cash that is coming in is a good number. I'm not getting the feeling that we know what is going out the door and what is coming in the door." (DSOF at ¶ 70).

The most specific request Boris made was for Plaintiff to ensure that there was a "plan" in place to track and rectify the cash flow issues. (*See e.g.*, DSOF at ¶ 38). Boris instructed Plaintiff to develop no less than three "action plans" between mid-March and Plaintiff's termination in July. (*See* Def.'s Exs.' I-K). Despite believing that previous plans

had not had enough time to be implemented, Plaintiff produced new plans as per Boris' requests. (*Id.*; Montone Notes at 6).

In other emails, Boris requested information that, according to the Plaintiff, was impossible to produce. (*See* Montone Dep. at 321:13-21, 323:2-8). Boris expected Plaintiff to provide "answers" for her to relay to Simodejka as to when and how much payment could be expected on a given day. (*Id.*; DSOF at ¶ 64). However, Plaintiff testified that in light of CPSI's limitations, such information could not be readily produced. (Montone Dep. at 321:13-21, 323:2-8).

In sum, a reasonable jury could conclude that Plaintiff was "micromanaged" and eventually "scapegoated" for CPSI's failures and Defendant's financial issues. (EEOC Resp. at ECF 40; DCSOF at ¶ 181). Nevertheless, the issue in a retaliation claim is "not whether the employer is wise, shrewd, prudent or competent." *Fuentes*, 32 F.3d at 764-65, Instead, Plaintiff must also demonstrate that her invocation of the FMLA leave was a factor in Defendant's discharge decision. *See Lichtenstein*, 691 F.3d at 301-02. Here, Plaintiff has adduced sufficient evidence to allow a reasonable fact finder to conclude that Defendant's proffered rationale for her termination was a pretext and that her use of FMLA played a role in her termination. Four factors compel this conclusion.

First, the temporal proximity between Plaintiff's FMLA leave and her discharge tends to support an inference of pretext. *See Jalil v. Avdel Corp.*, 873 F.2d 701, 708 n.6 (3d Cir. 1989) (citing *Dillon v. Coles*, 746 F.2d 998, 1003 (3d Cir. 1984) ("[T]he *McDonnell-Douglas*

formula does not compartmentalize the evidence so as to limit its use to only one phase of

the case. The plaintiff's evidence might serve both to establish a *prima facie case* and

discredit a defendant's explanation.")). Defendant was on FMLA leave two consecutive

work days, Friday, July 23 and Monday, July 26, 2010, and then discharged the following

day, Tuesday, July 27, 2010. (Montone Notes at 25-26).

Second, Plaintiff contends that Defendant blamed her for factors beyond her

control—CPSI failures and lack of adequate staffing. (EEOC Resp. at ECF 39-40).

Defendant argues that such considerations cannot provide a basis for finding pretext, citing

two unpublished Third Circuit decisions. (Def.'s Br. in Supp. at 25-26, 39 (citing *Horvat v.*

*Forbes Reg'l Hosp.*, 184 F. App'x 216 (3d Cir. 2006); *Rhoades v. Young Women's Christian*

*Ass'n of Greater Pittsburgh*, 423 F. App'x 193 (3d Cir. 2011))). However, *Horvat* and

*Rhoades* are inapposite to the case at bar. In *Rhoades*, the plaintiff failed to complete

concrete objectives set forth in a poor performance review. 423 F. App'x at 199. Likewise,

in *Horvat*, the employer's performance review informed the plaintiff of "concerns regarding

her inadequate job performance and failure to implement [her employer's] cost-savings and

management initiatives." 184 F. App'x at 218. When the plaintiff failed to improve her

admittedly deficient job performance, the employer fired her. *Id.* at 218-19.

Here, in contrast, Plaintiff did not receive poor performance reviews. (EEOC Resp.

at ECF 39, 41). Moreover, Defendant does not allege that Plaintiff failed to implement

specific directives. Rather, Defendant asserts Plaintiff's performance was generally

"deficient in that the Hospital experienced a significant, revenue shortfall under her leadership." (Def.'s Br. in Supp. at 25). Finally, Defendant does not admit that her performance was poor. (EEOC Resp. at ECF 39). Instead, Plaintiff asserts that her employment record was "stellar." (Id.).

A third factor that tends to indicate that Plaintiff's FLMA leave may have played a role in her discharge is Plaintiff's assertion that Boris prohibited her from taking time off absent a request for FMLA. (Montone Dep. at 234:24-235:5). Plaintiff alleges that on March 5, 2010, she cancelled a preapproved vacation day that she intended to use to receive physical therapy and take her mother shopping. (DSOF at ¶¶ 100-01). Plaintiff's notes indicate that on March 4, 2004, Boris contacted her inquiring as to whether Plaintiff had plans for her day off. (Montone Notes at 3). Boris allegedly asked whether Plaintiff could work in the morning. (Id. at 4). According to Plaintiff, Boris told her that she "was being watched and it wouldn't look good if [Plaintiff] took time off when the hospital needed money." (Id.). As a result, Plaintiff "worked the whole day." (Id.).

Moreover, Boris allegedly routinely threatened and yelled at Plaintiff. (PASOF at ¶ 35; Montone Dep. at 374:12-17). According to Plaintiff, Boris told her that she and her department were on the "chopping block" three to four times a week. (PASOF at ¶ 35). Plaintiff also testified that Boris told informed her that the CEO was watching her, that she should be careful and that she was going to be fired due to Defendant's poor finances. (DSOF at ¶ 37). In light of Boris' alleged statements and Defendant's financial situation, a

reasonable jury could infer that Defendant "frowned upon" Plaintiff taking FMLA leave (see

Montone Dep. at 377:3-7) and might have been inclined to retaliate against Plaintiff for

exercising her FMLA rights.

Finally, Plaintiff's allegation that Boris "grilled" her about her use of FLMA supports

an inference that Defendant considered Plaintiff's FMLA use in its termination decision.

(See Montone Notes at 19-21). Plaintiff's notes indicate that she met with Boris on April 13,

2010. (Id. at 15). Plaintiff's notes state, in pertinent part:

> The meeting started by Diane [Boris] telling me that John [Simodejka], . . . &
> herself are concern[ed] with what my intension [sic] is with my FMLA. She
> didn't know if she should [or] could ask me[,] but they were concerned if I was
> looking for a job when I would take a day off ??

(Id.).

According to Plaintiff's notes, she took FMLA days between April 29 and May 12,

2010, and upon her return, Boris

> began by questioning my medical leave and [said] her [sic] & [Simodejka] . . .
> are still concerned that I'm actively looking for a job. I explained to her, 3rd
> time, that the reason I took an FMLA was because I do, whether I like it or
> not[,] have an illness[,] and there are days that I am so exhausted that I can't
> get up, or my legs ache or I have this weird feeling on the [right] side of my
> head, but that I will only take off when I really need too. I don't understand
> why I continue to get grilled for an FMLA.

(Id. at 19-21).

Defendant contends that Boris' questioning is not evidence of pretext since "there is

no right in the FMLA to be 'left alone,'" and "[n]othing in the FMLA prevents employers from

ensuring that employees who are on leave from work do not abuse their leave." (Def.'s

Reply Br., Doc. 37, at 12 (citing *Callison v. City of Philadelphia*, 430 F.3d 117, 119-120 (3d

Cir. 2005)). While it is true that an employer can inquire about the authenticity of an

employee's use of FMLA without giving rise to an interference claim, *Callison*, 430 F.3d at

119-120, Defendant cites no law to support its further conclusion that such questioning is

not probative in a retaliation claim. Instead, Boris' alleged "grilling" of Plaintiff indicates that

her use of FMLA was a "concern" for Plaintiff's supervisors in the months leading up to her

discharge. (Montone Notes at 15, 19-21).

In sum, the four factors discussed above create the sort of "weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered

legitimate reasons for its action that a reasonable factfinder could rationally find them

'unworthy of credence.'" *See Fuentes*, 32 F.3d at 765. As a result, the Plaintiff has raised

enough genuine issues of material facts to preclude summary judgment.

## V. Conclusion

For the foregoing reasons, the Court will deny Defendant's Motion for Summary

Judgment (Doc. 28) as to Count IV. Because Plaintiff expressly withdraws Counts I-III, V,

the Court will dismiss Counts I-III, and V with prejudice. A separate Order follows.

Robert D. Mariani
United States District Judge